WES A. ROBINSON ET AL., Appellants, v. J. B. CANNON ET AL., Respondents, HARRY C. CARROLL ET AL., Appellants. No. 36,692.

WES A. ROBINSON ET AL., Appellants, v. WILLIAM A. CANNON ET AL., Respondents, HARRY C. CARROLL ET AL., Appellants. No. 36,693.

WES A. ROBINSON ET AL., Appellants, v. T. H. ELLOITT ET AL., Respondents, HARRY C. CARROLL ET AL., Appellants. No. 36,694.

WES A. ROBINSON ET AL., Appellants, v. T. C. KNAPP ET AL., Respondents, HARRY C. CARROLL ET AL., Appellants. No. 36,695.

WES A. ROBINSON ET AL., Appellants, v. ALBERTA E. TAYLOR ET AL., Respondents, HARRY C. CARROLL ET AL., Appellants.—145 S. W. (2d) 146. No. 36,696.

Division Two, December 3, 1940.

*May & May* for Wes A. Robinson et al.; *Creech & Creech* for Carroll, Carroll and Reid.

*Cullen, Storckman & Coil* for respondents.

WESTHUES, C.—These suits involve the question of whether defendants, the legal title holders of certain real estate, violated a restriction against the sale of intoxicating liquor and thereby forfeited their title. The trial court entered a judgment in favor of the defendants, owners of the property, whereupon plaintiffs and certain named defendants appealed.

There are five of these cases. They all involve the same question, and by stipulation of the parties, evidence introduced in one case was considered by the trial court as evidence in each of the other cases. In this court a joint abstract of the evidence was filed by the appellants in the five cases.

The origin of this controversy dates back to the year 1879, when Robert T. Elsberry, William McIntosh, John O. Roberts and Henry S. Carroll, by deeds *inter sese*, conveyed the land here in question and platted it into town lots upon which was built the town of Elsberry, Missouri. The real estate in controversy in these cases consists of lots in the business section of Elsberry. The restriction in the deeds reads as follows:

" 'Witnesseth, That the said Party of the First Part in consideration of the sum of ——— Dollars to him paid by the said Parties of the Second Part, the receipt of which is hereby acknowledged, and also for the further consideration of the agreement between the parties hereto for themselves, their heirs, successors and legal representatives, that intoxicating liquors shall never be manufactured, sold, or otherwise disposed of as a beverage in any place of public resort in or upon the premises hereby granted, or any part thereof; and it is herein and hereby expressly reserved by the said Party of the First Part that in case of any of the above conditions concerning intoxicating liquors are broken by said Parties of the Second Part, their assigns, or legal representatives, then this deed shall become null and void, and all right, title and interest of, in and to the premises hereby conveyed shall revert to the said Party of the First Part, his heirs and assigns.' "

It was conceded that the purpose of the above restriction was not to curtail competition in the liquor business, but as appellants state the restrictors had in mind a higher and loftier purpose. From their brief we quote the following:

"Each one and particularly Robert T. Elsberry had the future interest of the town and its citizens at heart and desired that the evil of intoxicating liquor should never raise its ugly head in that community."

Appellants in each case are the heirs of either Elsberry, McIntosh, Roberts or Carroll. A number of heirs were joined as defendants and are appellants here, having the same interests as plaintiffs, appellants. Respondents consist of the present owners of the property. They were made defendants in the suits.

The evidence in case number 36692 showed that J. B. Cannon was the owner of the property and Mrs. D. Frances Reed was the tenant. To sustain the charge that the owner, J. B. Cannon, had forfeited his title to the lots, being part of lots 122, 123 and 124, west half of block 11 of Elsberry, it was shown by the evidence that the property was leased to defendant, Mrs. D. Frances Reed, who conducted a restaurant upon the premises and in connection with said business sold five-per-cent beer under a license duly issued.

In case number 36693 the defendant, William A. Cannon, was the legal owner of the property, being lots 231 and 232 in block 26 of Elsberry, Missouri. The evidence showed that J. B. Cannon, son of William A. Cannon, was operating a drug store upon this property and in connection therewith had a license to retail whisky in the original package and had pursuant thereto sold whisky in the original package.

Case number 36694 involved a part of lots 49 and 50, block 3 of the town of Elsberry. Defendant T. H. Elliott was the legal owner of the property and defendant James N. Metts the tenant. The tenant conducted a general merchandise store, dispensing groceries, clothing, hardware, and also whisky in the original package for which the tenant had obtained the license required by law.

Case number 36695 involved lots 74 and 75 and part of lots 76 and 77 in block 12 of the town of Elsberry. Defendants T. C. Knapp, Frank H. Watson and Emby Watson were the legal owners of the property and defendant Reavis Patton was the tenant. The tenant handled groceries, whisky by the package and also conducted a restaurant. License to sell intoxicating liquor had been obtained. This place was referred to in the evidence as the "Hot Cat." Further reference to that will be made later.

Case number 36696 involved part of lots 125, 126 and 127, Block 12 of the town of Elsberry. Defendant Alberta E. Taylor was the legal owner of the premises and defendant Reavis Patton was the tenant. The tenant conducted a restaurant on the premises and in connection therewith sold five-per-cent beer for which the tenant had obtained the necessary license.

Respondents, owners of the property, as a defense asserted that the restriction in the deeds was not violated by them because the

restriction applied only to saloons. Respondents say the words, "that intoxicating liquors shall never be manufactured, sold or otherwise disposed of as a beverage in any place of public resort in or upon the premises hereby granted," when interpreted in the light of the times, that is in the light of the year 1879, could only mean a restriction against the sale of liquor in saloons as they existed at that time. Again, respondents asserted that if the business conducted by them violated the restriction, then in that event the right of forfeiture was waived by appellants and their ancestors.

The view we have taken of the case renders it unnecessary to note other defenses set up by respondents. Robert T. Elsberry was the principal instigator of having the restriction placed in the deeds. He lived for a number of years after the town of Elsberry was established. The importance of this will be noted later. Considering the question of waiver we must keep in mind the object to be accomplished by the restriction. Appellants say the intent of the restriction was that "the evil of intoxicating liquor should never raise its ugly head in that community." We must also keep in mind that to accomplish that purpose the restriction was placed in the deeds affecting the business blocks only. Beyond the business blocks no restriction was in existence. As to the evidence of waiver it was shown that during the lifetime of Elsberry and after the restriction was in effect, whisky was sold in great abundance in Elsberry upon the restricted premises. This continued for a long number of years. There is evidence in the record that about the year 1900 the traffic in whisky was rather notorious. Appellants contend, however, that the sales during those years were not violations of the restriction because the sales were not for beverage purposes but for medicinal purposes only. The evidence justifies the inference that drug stores were numerous in Elsberry considering its number of inhabitants. And it is fair to assume from the evidence that these drug stores could only exist in such large numbers because of the whisky business. The idea that the whisky was sold and used for medicinal purposes only was of course a mere sham, so considered by the public, and the record disclosed that a number of convictions were had for violations of the liquor laws. As we read the record, the routine necessary to obtain whisky in those days was about as follows: A party desiring to purchase whisky would call on a doctor (who was always to be found at a drug store) and inform him, the doctor, of an ailment, whether real or fancied, from which the party suffered. The party desiring the whisky diagnosed his own case, decided for himself how much whisky was necessary for a cure and also decided the amount of the dose to be taken. The doctor would then obligingly hand either the party or the druggist a prescription, whereupon the sale of whisky followed. One witness, speaking of these drug stores, stated that they each had a doctor for the purpose of writing these prescriptions.

The difference in the method of the whisky business as conducted then and now in the town of Elsberry, as we view the situation, is that the hypocrisy has been removed. The evidence disclosed that Robert T. Elsberry knew of these conditions and lamented the fact that he could not do much about it. Note the evidence of witness C. W. Ferry:

"I am 71 years old and have lived in Elsberry ever since I have been a young man, I guess 20 or 21 years. Robert T. Elsberry was a grandfather of my wife; I knew him in his lifetime.

"During his lifetime drug stores operated in Elsberry. The drug stores were along Broadway east and west of the Cannon property. Five or six of these drug stores sprung up in Elsberry before his death. People would go in there and buy whisky. It continued until Mr. Elsberry's death, and they still had drug stores there after he died. The fact that they were drug stores selling whisky was a matter of conversation among the general public. I bought whisky in all of them. . . .

"He was visiting at my house and I used to make fun of him because he did not like the idea of selling whisky on his place, but he said he did not know what to do about it. Nothing was said about the two barrels being there. Each and every drug store had a doctor to write prescriptions."

Wes A. Robinson, a plaintiff, who insisted upon a forfeiture, testified as follows:

"I expect there was drug stores in Elsberry in 1900 between east of the bank towards the depot on the street that runs from Cannon's drug store to the depot. A fellow by the name of Marsh ran one and McAfee ran one.

"You got whisky on prescription. They used to arrest them and convict them for selling liquor. I think they agreed to quit and not sell any more. . . .

"I bought liquor at the 'Hot Cat.' I wouldn't say I bought a half a pint. Sometimes I bought a pint or a half pint. I took it in the premises or carried it away, whichever I wanted to. I bought beer but didn't buy liquor. I go in there and get a meal and drink a bottle of beer. I would go in there once every two weeks.

"I knew Mr. McAfee when he ran a drug store. I bought liquor from him. That's the property known as the Elsberry property. He was writing prescriptions at the time. Other people did complain —it was pretty bad—because they were disposing of beer and whisky."

We may pause to comment that no conviction for a violation of the liquor laws could have been had if whisky had been sold solely for medicinal purposes. Appellants in their brief state:

"It is fair to presume that the drunken orgies engendered by the flow of intoxicating beverages from these public places inspired the significant name in one instance of 'Hot Cat.' "

The record does not disclose whence the name Hot Cat, but if appellants are correct in their assumption the record does show that at least one of the plaintiffs materially aided in the baptizing, for by his own evidence he was a frequent patron of the place called Hot Cat. The record does affirmatively show that all the other places were conducted in an orderly manner and the record does not affirmatively show that the place called Hot Cat was disorderly, at least not as bad as the conditions were described to have been during the years when the drug stores dispensed a great amount of whisky. Appellants, the heirs of the grantors who placed the restriction and the forfeiture clause in the deeds, did not at any time make an effort to have the sale of liquor discontinued. Their first affirmative action was this suit to have a forfeiture declared and they, appellants, declared to be the owners of the property.

In an early Missouri case, McCollum v. The Niagara Fire Ins. Co., 61 Mo. App. 352, l. c. 353, the court said:

"Forfeitures are not favored, and all conditions or provisions in the contracts providing for them must be strictly construed."

And in Morrill v. Wabash, St. L. & P. Ry., 96 Mo. 174, l. c. 179, 9 S. W. 657, this court said:

"Again, conditions subsequent are not favored in law, and are construed strictly, because they tend to destroy estates."

Such is the law today. Sense of justice and good conscience forbid a court declaring a forfeiture in this case. The restriction placed in the deeds by Elsberry was waived by him during his lifetime. The evidence disclosed that Elsberry disliked the whisky traffic. He was probably of the opinion that he had safeguarded against this evil in Elsberry. However, the ingenuity of those tempted by the large profits in the business circumvented the restriction and before Elsberry died he fully realized that he had lost and abandoned the ship. If the business conducted now by the defendants violates the restriction, then certainly the restriction was violated by those who were found guilty of illegally selling whisky. That occurred years ago, and not one of the parties now claiming a forfeiture, or their ancestors, made any claim under the forfeiture clause. Again, numerous lots were sold outside the business blocks without the restriction. The only effect a forfeiture could have at this late date would be to take the property from the parties who bought and paid for it and improved it and transfer it to others. It would not bring about the condition hoped for by the author of the restriction. If there exists places in the town of Elsberry that are a nuisance and are violating the laws, the authorities can take care of that situation under the law.

Restrictive covenants upon land are to be strictly construed. [Gardner v. Maffitt, 335 Mo. 959, 74 S. W. (2d) 604, 95 A. L. R. 452.] A right to a forfeiture may be waived and when once waived cannot

be resurrected. [Garnhart v. Finney, 40 Mo. 449, l. c. 460; Nagel v. League, 70 Mo. App. 487, l. c. 491; Bredell v. Kerr and Board of Trustees of Westminster College, 242 Mo. 317, l. c. 337, 147 S. W. 105. See also 18 C. J. 379, sec. 435.] Silence on part of appellants and their ancestors during the many years that whisky was being sold, even though convictions for illegally selling whisky upon the restricted premises occurred, is strong evidence that the restriction and forfeiture had been waived. Even now appellants in this case make no demand that the restriction be enforced and thus attain the object of the restriction. But their sole object is to enforce a forfeiture and obtain the property for themselves.

The trial court's judgment in each case was for the right party and the judgment in each case is hereby affirmed. *Cooley* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.